PEAVY-BYRNES LUMBER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PEAVY-WILSON LUMBER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

PEAVY-MOORE LUMBER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 15822–15824, 16354–16356, 25984–25986.
Promulgated December 7, 1928.

*Joseph W. Bailey, Esq.*, and *Walter E. Barton, Esq.*, for the petitioners.

*J. E. Marshall, Esq.*, *L. L. Hight, Esq.*, and *A. S. Lisenby, Esq.*, for the respondent.

628

632

OPINION.

TRAMMELL: The petitioners claim affiliations between the Peavy-Byrnes Lumber Co. and the Peavy-Wilson Lumber Co. for the years 1917 and 1918, and between the Peavy-Byrnes Lumber Co., the Peavy-Wilson Lumber Co. and the Peavy-Moore Lumber Co. for the years 1919, 1920, and 1921, on the ground that substantially all of the stock of these companies was owned or controlled by the same or closely affiliated interests. The petitioners allege that there were 15 principal stockholders, whose names are set out in the findings

of fact, who owned or controlled substantially all of the stock of the three lumber companies.

Sections 240 (b) and (c) of the Revenue Acts of 1918 and 1921, respectively, which are controlling here for the years 1918 to 1921, inclusive, provide as follows:

For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

The only statutory provision for filing consolidated returns for 1917 is contained in section 1331 of the Revenue Act of 1921 (*Canyon Lumber Co.*, 1 B. T. A. 473), which reads as follows:

SEC. 1331. (a) That Title II of the Revenue Act of 1917 shall be construed to impose the taxes therein mentioned upon the basis of consolidated returns of net income and invested capital in the case of domestic corporations and domestic partnerships that were affiliated during the calendar year 1917.

(b) For the purpose of this section a corporation or partnership was affiliated with one or more corporations or partnerships (1) when such corporation or partnership owned directly or controlled through closely affiliated interests or by a nominee or nominees all or substantially all the stock of the other or others, or (2) when substantially all the stock of two or more corporations or the business of two or more partnerships was owned by the same interests; *Provided,* That such corporations or partnerships were engaged in the same or a closely related business, or one corporation or partnership bought from or sold to another corporation or partnership products or services at prices above or below the current market, thus effecting an artificial distribution of profits, or one corporation or partnership in any way so arranged its financial relationships with another corporation or partnership as to assign to it a disproportionate share of net income or invested capital.

It is shown in the findings of fact that the 15 stockholders mentioned, and the members of their respective families, owned of the total stock of the three lumber companies amounts varying from a minimum of approximately 68.80 per cent to 94.86 per cent, during the years under review. A small amount of stock was owned by employees, who were enabled to purchase the stock through financial assistance rendered by A. J. Peavy. Taking this stock into consideration, we find that during 1919, which may be regarded as fairly representative of the stock ownership during the various years, the 15 principal stockholders, their families and the employees owned approximately 94.65 per cent of the stock of the Peavy-Byrnes Co., 83.31 per cent of the stock of the Peavy-Wilson Co., and 85.51 per cent of the stock of the Peavy-Moore Co.

During 1919 the majority stockholders voted in person and by proxy 98.6 per cent of the stock of the Peavy-Byrnes Co. represented, which was 89 per cent of the total stock outstanding; and of the stock of the Peavy-Wilson Co. they voted in that year 96.7 per cent of the

stock represented, which constituted 74 per cent of the total stock outstanding. In 1920 these same stockholders so voted 100 per cent of the stock of the Peavy-Byrnes Co., both represented and outstanding; 96.8 per cent of the stock of the Peavy-Wilson Co. represented, which was 77 per cent of the stock outstanding; and 95.7 per cent of the stock of the Peavy-Moore Co. represented, which was 86 per cent of the total stock outstanding. In 1921 the majority stockholders voted 99 per cent, 99.8 per cent, and 96 per cent of the stock of the respective companies represented at the stockholders' meetings, which constituted 94 per cent, 88 per cent, and 88 per cent of the total stock of the three companies, respectively, then outstanding.

It thus appears that only negligible percentages of stock were actually voted by minority stockholders either in person or by proxy, and the record further discloses that entire harmony prevailed at all times, all of the stockholders working together under the leadership of A. J. Peavy and his associates among the majority stockholders, for the joint welfare and best interests of the three corporations considered collectively. No effort was made at any time by any minority or other stockholder to secure preferred treatment for one company at the expense of any other.

The three companies were operated as one large enterprise, composed of three producing units. The three lumber companies, together with the three railroad companies which served the sawmill plants, maintained joint executive offices in Shreveport, La., although each lumber company had a separate mill office at its plant. The three lumber companies had the same sales manager, and their products were sold by the same salesmen. The salesmen were provided with stock sheets of all three companies, but took orders only in the name of the Peavy-Byrnes Lumber Co. When the orders were received at the executive offices, the sales manager allocated them to the three companies according to the lumber on hand as shown by the stock sheets. The company to which an order was allocated shipped the lumber and made collection therefor.

A. J. Peavy directed the policies and supervised the business of all the companies, including the railroad companies, from the same desk in the executive offices. No record was kept of the time which he devoted to each company's affairs. The other officers and employees in the executive offices rendered services upon the same basis. All office and traveling expenses were paid by the Peavy-Byrnes Co., and at the end of each month were allocated to the three lumber companies in proportion to the amount of lumber shipped by each. Items of traveling and other expenses incurred solely for the benefit of one particular company were nevertheless

allocated among the three companies on the same basis as other general expenses. There was considerable borrowing of funds by one company from another. Particularly, the Peavy-Byrnes Co. loaned large sums to the other two. However, interest was charged on the loans at 6 per cent to maturity, and at the rate of 8 per cent after maturity.

The three lumber companies had identically the same executive officers, and substantially the same boards of directors during all the years involved.

In *Midland Refining Co.*, 2 B. T. A. 292, we had facts before us similar in many respects to those presented here. In considering the question whether substantially all the stock of the two corporations there involved was owned or controlled by the same interests, within the meaning of section 240 (b) of the Revenue Act of 1918, *supra*, we said:

Immediately after the organization of the companies Osborne and Skelly owned 90 per cent of the stock of the Midland and 78.26 per cent of the stock of the Inland. A part of this stock was sold to employees, business associates, and close personal friends of the two men named. From the evidence it is clear that these two individuals so disposed of their stock as to assure themselves of the actual control and domination of both companies. * * * Skelly, Osborne and Pielsticker were practically the only stockholders who ever attended meetings. They owned 62.71 per cent of the stock of the Midland and 51.07 of the stock of the Inland. At these meetings they voted by proxy all stock not standing in their own names.

    *      *      *      *      *      *      *

A careful examination of the stockholdings and the relationships existing between the various holders shows that substantially all of the stock is owned or controlled by the same individuals. It seems to follow, naturally, if a group of individuals owns or controls substantially all of the stock of both corporations, and if such ownership or control is by all exercised for one purpose, namely, the joint success of the corporations, that these individuals meet the requirements of the words "the same interests."

We believe that the two corporations were affiliated and that any other conclusion would be contrary to the meaning of the statute.

In the proceedings now before us, the 15 principal stockholders, members of their families, and the employees, during 1919 owned 94.65 per cent of the stock of the Peavy-Byrnes Lumber Co., 83.31 per cent of the stock of the Peavy-Wilson Lumber Co. and 85.51 per cent of the stock of the Peavy-Moore Lumber Co., which is fairly representative of the stock ownership in the other years. The minority stock in each company was practically all owned by close business associates of the majority stockholders, that is to say, such minority stock was mostly owned by business partners of one or more of the principal stockholders, or by the officers and/or direc-tors of the two banks which were the depositories of the funds of

the corporations, and which financed many of their operations. Some of the majority stockholders of the petitioner corporations, including A. J. Peavy, were officers and/or directors of the banks. Only a negligible percentage of the minority stock was ever voted at any of the stockholders' meetings other than that voted by the majority stockholders by proxies. The principal stockholders were practically the only stockholders who ever attended meetings, and at such meetings they voted in person and by proxy from about 95 to 100 per cent of the stock represented. That A. J. Peavy and his associates among the majority stockholders exercised actual control and domination of all the corporations can not be doubted from the evidence, and it is equally well established that their ownership or control was by all exercised for the joint success of the corporations.

In *Adolph Hirsch & Co.*, 7 B. T. A. 707, it appears that the two Hirsch brothers owned 94.85 per cent of the stock of the Hirsch Company and 55.63 per cent of the stock of the Brazilian Company. The minority stock was in the hands of friends and associates of the Hirsch brothers, who had been induced to go into the venture on account of its speculative nature. In holding that the two corporations were affiliated, we quoted from our opinion in the *Midland Refining Co.* case, *supra*, and said:

The stockholdings and conduct of the two corporations involved in this proceeding meet the above requirements.

In *Ajax Enameling & Foundry Co.*, 7 B. T. A. 1230, we held that two corporations were affiliated within the meaning of the provisions of the Revenue Acts of 1918 and 1921, quoted *supra*, where the facts disclosed that the owners of 72.6 per cent of the stock of one corporation owned 94.40 per cent of the stock of the other, both corporations having the same officers and substantially the same directors, and the minority stock was held either by relatives of the principal stockholders or employees, who never cast any dissenting vote.

In *Badger Talking Machine Co.*, 8 B. T. A. 455, we said:

The facts here show that the petitioner and the Interstate Music Corporation had, (1) common interest, and purpose of joint success, (2) the same officers and interlocking directors, (3) minority stock held by either persons related by blood or marriage or by employees, business associates and friends, (4) business harmony evidenced by friendly minority stockholders, (5) control exercised by proxies, (6) and that the owners of the stock of the petitioner owned 66.8 per cent of the stock of the Interstate Music Corporation.

We believe from the above state of facts that all the elements of affiliation are present and that any other conclusion would be contrary to the meaning of the statute.

What was said concerning the relationship of the corporations in the case last above cited may substantially be said of the relationships of the corporations involved herein.

It is our opinion, and we so hold, that the Peavy-Byrnes Lumber Co. and the Peavy-Wilson Lumber Co. were affiliated during the calendar years 1917 and 1918, and that the Peavy-Byrnes Lumber Co., the Peavy-Wilson Lumber Co. and the Peavy-Moore Lumber Co. were affiliated during the calendar years 1919, 1920, and 1921 within the meaning of the statutes above quoted.

The issue of affiliations raised by the petitioners in these proceedings also involves the question whether the Peavy-Wilson Lumber Co. and its subsidiary, the Christie & Eastern Railway Co., were affiliated during the years 1917, 1918, and 1919. The respondent allowed affiliation between these companies for the years 1920 and 1921, but denied affiliation for the years 1917, 1918, and 1919, now claimed by the petitioners.

The evidence shows that prior to the organization of the Christie & Eastern Railway Co. on February 1, 1917, the Peavy-Wilson Lumber Co. had begun the construction of a railroad, which was necessary before its sawmill could be located. Thereafter, it was decided that a separate corporation should be organized to construct and operate the railroad, in order to secure the right of eminent domain and to derive revenue from sources other than the business of the lumber company. Accordingly, six of the directors of the lumber company, who were also stockholders, took out a charter for a corporation to be known as the Christie & Eastern Railway Co. This corporation had an authorized capital stock of $15,000, all of which was issued to the six directors and stockholders of the lumber company, to be held in trust for it, except 10 shares which were issued to a brother of A. J. Peavy, and one share which was issued to an employee who was not a stockholder of the lumber company. Including the stock issued in the name of A. J. Peavy's brother, the six directors held in their names as trustees for the lumber company 99.34 per cent of the original authorized capital stock of the railroad company.

The railroad was turned over to and its construction completed by the Christie & Eastern Railway Co. The railroad company borrowed from the lumber company the funds necessary to construct and equip the railroad, and it was operated as a plant facility of the lumber company. During the years 1917 to 1919, inclusive, from 84 per cent to 90 per cent of the revenue of the railroad company was derived from the business of the lumber company.

In 1920 the authorized capital stock of the railroad company was increased to $100,000, and all the stock was thereupon subscribed for

and issued to the stockholders of the lumber company in the ratio of one share of the railroad company's stock to 10 shares of the lumber company's stock. Upon this basis, the respondent allowed affiliation of the companies for 1920 and 1921.

The question whether the railroad company and the lumber company were affiliated in the years prior to 1920 depends upon whether the directors of the lumber company held the stock of the railroad company in trust for the former. The respondent contends that the evidence is not sufficient to establish this fact.

We have carefully examined the record, and the only direct evidence on this point establishes, in our opinion, that the stock of the railroad company was so held by the directors of the lumber company. A. J. Peavy testified in substance that the six directors of the Peavy-Wilson Co. took out the charter for the Christie & Eastern Railway Co. and held the stock for the lumber company in their own names; that later, when the railroad company's charter was amended, the original subscribers received stock in the Peavy-Wilson Lumber Co. to the amount of their investment in the railroad company, and that such was the understanding when the stock was originally issued to them. Accordingly, we have found, as set forth in our findings of fact above, that the stock of the Christie & Eastern Railway Co. issued in 1917 was held by the directors of the Peavy-Wilson Lumber Co. in trust for that company. In addition to the direct evidence referred to, this conclusion is further strengthened by the fact that the railroad company suffered losses during the years 1917, 1918, and 1919 in the aggregate amount of $35,394.74, during which years it had an authorized and outstanding capital stock of only $15,000. Yet in February, 1920, the lumber company issued its capital stock in exchange for the original capital stock of the railroad company, upon the basis of par value of both stocks, thus substantially treating the losses of the railroad company as its own.

Having reached the conclusion indicated, it follows, we think, that the Peavy-Wilson Lumber Co., during the years 1917, 1918, and 1919, " owned directly or controlled through closely affiliated interests or by a nominee or nominees " substantially all the stock of the Christie & Eastern Railway Co., and that the corporations during the years 1918 and 1919 were affiliated within the purview of section 240 (b) of the Revenue Act of 1918, *supra.*

With respect to affiliations during 1917, the statute imposes further conditions, which must be considered. The restrictions on affiliations in 1917, which are in addition to those imposed under the provisions of the Revenue Acts of 1918 and 1921, *supra,* are set forth in section 1331 (b) of the Revenue Act of 1921, the applicable part of which reads as follows:

*Provided,* That such corporations or partnerships were engaged in the same or a closely related business, \* \* \* but a railroad or other public utility which was owned by an industrial corporation and was operated as a plant facility or as an integral part of a group organization of affiliated corporations which were required to file a consolidated return, shall be construed to have been affiliated.

That the corporations under consideration met these additional requirements during 1917, is, we think, too clear to require extended discussion. From 84 per cent to 90 per cent of the revenues of the railroad company was derived from the business of the lumber company. The lumber company could not have operated its sawmill without the transportation facilities provided by the railroad company. Each was dependent upon the other for its existence. The two corporations were engaged in the same or a closely related business. The railroad was operated as a plant facility of the lumber company, which was an industrial corporation, and which also owned substantially all the stock of the railroad company.

It is our opinion that the Peavy-Wilson Lumber Co. and the Christie & Eastern Railway Co. were also affiliated during 1917, from the date of organization of the latter corporation, within the purview of section 1331 (b) of the 1921 Act, supra.

The Peavy-Byrnes Lumber Co. claims that either it is entitled to deduct each year, as cost of timber under the Krause & Managan Lumber Co. contract, one-half of the net profits of the Peavy-Byrnes Co., or that the 2,500 shares of capital stock issued to the Krause & Managan Lumber Co., Ltd., in 1913 were worth $562,500, and represented payment for the timber contract; and that this amount should be included in invested capital and be subject to exhaustion or depletion based upon the quantity of timber included in the contract.

As set forth in the findings of fact, the Krause & Managan Lumber Co. entered into an agreement in 1909 with the Peavy-Byrnes Lumber Co., whereby it agreed to sell to the latter the right to cut all sound merchantable pine timber of a diameter of 12 inches and upwards at the stump upon certain described lands. The Peavy-Byrnes Co. agreed to pay a certain royalty rate and additional payments as timber was cut.

As a further consideration the contract provided that when the net profits from the operations of the mill of the Peavy-Byrnes Co. had repaid to the stockholders of the Peavy-Byrnes Co. their total original investment, the Peavy-Byrnes Co. should pay the Krause & Managan Co. one-half of all net profits from the further operations of said mill, and transfer a one-half interest in all the property and assets of the Peavy-Byrnes Co. or one-half of its capital stock, at the option of the Krause & Managan Co. Dividends equaling at least 90 per cent of the net profits were to be declared annually as

repayment of the original investment, as previously provided. On July 28, 1913, the Krause & Managan Co. elected to take 50 per cent of the capital stock and, accordingly, there were issued to it 2,500 shares of a par value of $250,000.

From the above agreement of sale of timber rights it appears that there was an outright transfer of such rights from the Krause & Managan Co. to the Peavy-Byrnes Co., but the contract provided that additional consideration should be paid therefor upon the happening of certain events in the future. Until such condition occurred no payments were required, except the payments per thousand feet as timber was cut. The Peavy-Byrnes Co. was in possession of the property and was entitled to all of the net profits from the operation thereof until such time as the net profits had paid back the original investment to the stockholders of the Peavy-Byrnes Co. This contingency might have been predicted in the near future, or might not have occurred until the timber had been exhausted, or might not have happened at all. However, the condition was met some time prior to July 28, 1913, and on that date the Krause & Managan Co. had the right to demand one-half of all the assets, which included mill, appurtenances, belongings, and timber rights, and one-half of the future net profits, or the right to demand one-half of the capital stock.

The petitioner has argued that the payment of one-half of the net profits was provided for in the contract, regardless of which option the Krause & Managan Lumber Co. chose, and, therefore, claims that one-half of the net profits each year was payment on the purchase price of the timber rights. Section 14 of the contract is clear and unambiguous. It provided that the Krause & Managan Lumber Co. had the option to take either half the assets and profits or, in lieu therof, half the capital stock. The action of the parties themselves clearly indicates that when the Krause & Managan Co. elected to take one-half of the capital stock it did not also retain its rights under the contract to one-half of the net profits separate and apart from the stock ownership. The stock ownership resulted in the Krause & Managan Lumber Co. having a right to half of the dividends declared, and placed that company on an equal basis with the other stockholders. All of the payments subsequently made to the Krause & Managan Lumber Co., except the royalty payments, were designated dividends, and were so entered on the books, and no entries were made on the books from 1913 to 1917 of any amounts representing one-half of the net profits as being paid on the purchase price of the timber rights.

This is further brought out in the resolution adopted at the special meeting of the directors of the Peavy-Byrnes Co. on July 26, 1913, wherein it is stated:

WHEREAS, the Krause & Managan Lumber Company has exercised its option to take an equal amount of the capital stock of the company to the amount that has been issued as evidence of their ownership of one-half of the property and future earnings, therefore be it

RESOLVED: That the President and Secretary of this company be authorized and instructed to issue to the Krause & Managan Lumber Company, or as they direct, stock of the Peavy-Byrnes Lumber Company to the amount of $250,000.00.

It is, therefore, our opinion that on July 28, 1913, 2,500 shares of stock of the Peavy-Byrnes Lumber Co. of the par value of $250,000, were issued to the Krause & Managan Lumber Co. in payment for certain assets consisting of timber rights, and which constituted tangible property.

The Revenue Acts of 1918 and 1921, in section 326 (a), define the term " invested capital," as meaning, in so far as material here, (1) actual cash bona fide paid in for stock or shares, and (2) actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment.

It follows that for the years 1918 to 1921, inclusive, said petitioner is entitled to include in invested capital an amount based upon the actual cash value of the assets so paid in for stock or shares, at the time of such payment. The question then arises as to the value of the assets paid in for stock, and as to when or at what time they were paid in.

It is contended by the petitioner that since the Krause & Managan Lumber Co. had the right to receive a one-half interest in all the property and assets of the Peavy-Byrnes Co. and one-half of the net profits, or one-half of the capital stock, the transaction amounted in substance to an exchange of a one-half interest in the assets and profits for one-half of the capital stock. It is argued that if the assets and the right to one-half the profits had been received by the Krause & Managan Co. and then exchanged for one-half of the capital stock of the Peavy-Byrnes Co., the parties would have been in the same situation as if one-half of the capital stock of the latter company had been issued as additional compensation for the timber rights of the former company. But we must consider not what the parties might have done, but what they actually did. The fact is that the Krause & Managan Lumber Co. had the option to take either one-half the assets and profits, or one-half the stock. If it had taken the former and then exchanged them for stock, undoubtedly the value of those assets at the time paid in for stock should be included in invested capital, and the depletion allowance would be determinable on the basis of that transaction. However, such trans-

action did not occur. The Krause & Managan Co. parted with their timber rights in 1909, and did not at any time thereafter reacquire them, or any part of them, to exchange for stock in the Peavy-Byrnes Co.

The Peavy-Byrnes Co. was liable, on the happening of a certain event, to transfer and deliver to the Krause & Managan Co. additional compensation for the timber rights, over and above the royalty rate of $4 per thousand feet of lumber cut. This liability was satisfied on July 28, 1913, when the Peavy-Byrnes Co. issued one-half of its capital stock to the Krause & Managan Co. The transaction amounted to the paying of the contract royalty for the timber cut, and the issuing of the stock in 1913. The timber rights, however, were acquired by the Peavy-Byrnes Co. in 1909, and for invested capital purposes, under the Revenue Acts of 1918 and 1921, must be valued as of the date they were paid in. The fact that the stock was not issued until 1913 does not change the rule of the statute that only the actual cash value of the assets paid in for stock at the time of such payment may be included in invested capital. It is not important that the stock was issued at a later date, nor is it material that the assets which the Krause & Managan Co. might have demanded and received in lieu of the stock be considered as determinative of the value of the stock, as we are not here concerned with what the values might have been in July, 1913. We would have been concerned with the values as of that date only in the event that the assets were paid in for stock on that date. This the record does not warrant us in holding.

The question, then, is, What was the value of the assets paid in for stock in 1909, for which the stock was issued in 1913?

No testimony was directed toward the value of the timber rights in 1909. However, we believe there is sufficient evidence in the record to enable us to determine such value. It was in effect testified by competent witnesses without contradiction that the fair market value of the standing timber in 1909 was $4 per thousand feet. This value, however, must be reduced by the then present worth which is assignable to the royalty interest reserved by the Krause & Managan Co. of $4 per thousand feet as the timber was cut. A value of $4 per thousand feet for the whole tract is an entirely different thing from the present worth of a royalty of $4 per thousand feet, which is to be paid only as the timber is cut over the future years.

In valuing this royalty interest, we have a timber reserve of 154,-015,525 feet as of July 28, 1913, and a record of timber cut from 1909 to July 28, 1913, of 52,124,702 feet, which would give a total of 206,140,227 feet of standing timber in 1909. Under the terms of the contract, the petitioner was obligated to cut at least 20,000,000 feet of timber per year. Upon this basis, then, the life of the timber prop-

erty would be 10 years. The fact that the amount of timber actually cut was less than the minimum provided in the contract is not material here. The only basis for an estimate in 1909 was the contract, and we can assume that the parties intended to carry out the terms of this contract. A banker who testified as to the value of the petitioner's business and stock stated that in a business of this character 8 per cent was a reasonable return on the investment.

The present value in 1909 of a royalty rate of $4 per thousand feet, on the basis of a timber reserve of 206,140,227 feet with a life of 10 years and an interest rate of 8 per cent, would be $504,630. The value of the timber, inclusive of the royalty interest, that is, 206,140,-227 feet at $4 per thousand, would be $824,560. Therefore, the value of the petitioner's interest in the timber would be represented by the difference, or $319,930. This amount, then, should be considered in the computation of invested capital for the years 1918 to 1921, both inclusive, as representing the value of the assets paid in for stock in 1909.

The Revenue Act of 1917, which is controlling here for that year, provides in section 207 (a), in so far as pertinent to these proceedings, that "invested capital" means, (1) actual cash paid in, (2) the actual cash value of tangible property paid in other than cash, for stock or shares in a corporation, at the time of such payment, but in case such tangible property was paid in prior to January 1, 1914, the actual cash value of such property as of January 1, 1914, but in no case to exceed the par value of the original stock or shares specifically issued therefor, and (3) paid-in or earned surplus.

The tangible property here in question (that is, the timber rights of the Krause & Managan Co.) was paid in for stock of the Peavy-Byrnes Co. in 1909, which was prior to January 1, 1914. The actual cash value of such property, as of January 1, 1914, was in excess of the par value of the original stock or shares in the amount of $250,-000 specifically issued therefor in 1913. This conclusion is supported by the fact that the timber rights transferred to the petitioner had a net value in 1909 of $319,930, and as hereinafter shown, the value of the petitioner's timber at March 1, 1913, was $421,350.75, which was based upon a value of $5 per thousand feet, unincumbered by any royalty interest, while said value was $6 per thousand feet on July 28, 1913.

At July 28, 1913, the uncut timber reserve was 154,015,525 feet, and from that date to January 1, 1914, the petitioner cut 8,923,295 feet. From these facts, it is apparent, we think, that the value of the petitioner's timber at January 1, 1914, was in excess of $250,000.

Therefore, under the provisions of the Revenue Act of 1917, *supra*, the petitioner is entitled to include in invested capital for the year 1917 the actual cash value, as of January 1, 1914, of the property paid in for stock in 1909, but not to exceed the par value of the stock issued therefor in 1913, or the amount of $250,000.

The Revenue Act of 1917, *supra*, also provides that paid-in surplus may be included in invested capital, and the amount by which the value of the property paid in for stock in 1909 exceeded the par value of the stock subsequently issued therefor constituted paid-in surplus.

The value of said property in 1909, when paid in, was $319,930, and the par value of the stock issued therefor in 1913 was $250,000. The difference between these two amounts, or the sum of $69,930, less the exhaustion or depletion sustained from 1909 to the taxable year, may be included in the petitioner's invested capital for 1917, as paid-in surplus.

The petitioner did not claim a depletion allowance based on the March 1, 1913, value of its timber, for the reason that it took the position that the timber rights were paid in for stock in July, 1913. It did, however, claim that it was entitled to a deduction on account of exhaustion, based upon the cost of such timber rights, which it contended were acquired on that date. Taking the position as we do, that the timber rights were acquired in 1909 and not in 1913, the petitioner is entitled to have the determination of the deduction to which it is entitled on account of the exhaustion of its timber rights then acquired for stock.

At March 1, 1913, there remained uncut 165,106,093 feet of timber. This timber, according to the undisputed testimony, had a value, unincumbered by any royalty interest, of $5 per thousand feet, or a total of $825,530.46. The value of the royalty interest of $4 per thousand feet must then be determined and deducted from the total value of the timber to arrive at the value of the petitioner's interest therein at March 1, 1913.

According to its past operating history, the petitioner was cutting approximately 16,000,000 feet per year, which would indicate an estimated remaining life of 10 years. This is further supported by the fact that it actually required 10 years to cut the timber, the cut having been finished in 1923. The record does not disclose whether the petitioner secured a waiver of the terms of the original contract entered into in 1909, or whether the terms of the contract were subsequently altered in order to permit a cutting of less than the 20,000,000 feet therein provided for. But here we have the actual conditions and evidence upon which to base an estimate of the expected life.

To make a valuation of the royalty interest, we have a royalty rate of $4 per thousand feet, a life of 10 years, and an interest rate of 8 per cent. From these figures, we conclude that the fair market value of the royalty interest at March 1, 1913, was $404,179.71. This amount deducted from $825,530.46, which is the value of the timber per thousand feet multiplied by the quantity of timber, leaves $421,-350.75, which represents the fair market value of the petitioner's timber at March 1, 1913, and which is the amount returnable as depletion on 165,106,093 feet of timber.

Pursuant to paragraph 13 of the contract between the Peavy-Byrnes Co. and the Krause & Managan Co., set out in our findings of fact above, certain payments were made in 1919, 1920, and 1921, in excess of the $4 royalty rate, based upon the sales price of lumber. The respondent allowed these amounts as deductions from gross income during those years, as selling expense. The petitioner claims that they represent additional cost of timber cut, and under issue 4 assigned said action of the respondent as error. Not one dollar of these payments was ever expended in connection with the sale of the lumber; they were made as additional purchase price thereof and should be so treated.

In computing the invested capital of the Peavy-Byrnes Lumber Co. during the years 1920 and 1921, the respondent computed a tentative tax for the year 1920 of $251,674.09 and for the year 1921 a tentative tax of $41,349.82, and reduced the current earnings available for distribution of dividends by those amounts. We have frequently passed on this question, and held that the computation of a tentative tax and the reduction of current earnings thereby is improper. The action of the respondent on this point is disapproved. *L. S. Ayers & Co.*, 1 B. T. A. 1135.

The respondent computed the inventory of the Peavy-Wilson Lumber Co. as of December 31, 1920, on the basis of cost, to be $405,138.82. At the hearing, the respondent conceded the right of this petitioner to inventory at cost or market, whichever was lower, and it was stipulated that the market price of the inventory f. o. b. cars at the mill on December 31, 1920, was $311,129.56, which included the cost of shipping and selling in the amount of $26,668.15 and the cost of hauling to planer and planing in the amount of $17,168.30. Said amount of $311,129.56 should, therefore, be reduced by $26,668.15, representing the cost of shipping and selling, and the sum of $17,168.30, representing the cost of hauling to the planer and the planing of the rough lumber, since these costs, which entered into the market price, had not been paid nor incurred. The lumber on hand in its rough condition is what is to be included in the inventory. When these costs are subtracted, the market value of the lumber is then shown to have been only $267,293.11, as the petitioner

contends. The lumber in question had not been shipped or sold, nor hauled to the planer or planed and the respondent, computing the inventory on the basis of cost, did not include charges of this nature in his computation.

The petitioner alleges that the respondent erroneously reduced invested capital of the Peavy-Byrnes Lumber Co. in 1920 by an amount of $54,312.72 and in 1921 by an amount of $45,048.58, on the theory that payments to nominees of the Krause & Managan Co. of $225,000 in 1920 and $250,000 in 1921 constituted payments of dividends. The effect of the payments of the above amounts upon income was fully discussed under issues two and three above, where we held that they were in fact dividends, as they purported to be. It follows that the action of the respondent in reducing invested capital on the theory that said amounts constituted dividends must be approved.

In accordance with the stipulation of the parties entered at the hearing, the Peavy-Byrnes Lumber Co. is entitled to a deduction from income for the year 1922 in the amount of $60,701.70 as ordinary and necessary expenses of operating a logging railroad; and the Peavy-Wilson Lumber Co. and the Peavy-Moore Lumber Co. are entitled to deductions from income for 1922 in the amounts of $117,391.59 and $51,335.23, respectively, as ordinary and necessary expenses of operating logging railroads.

Under issue No. 7, the Peavy-Byrnes Lumber Co. contends that it is entitled to a loss on a locomotive sold to the Peavy-Moore Lumber Co. in 1922. In his brief the respondent concedes that the uncontroverted evidence shows a cost price of $8,500 for the locomotive on December 6, 1919, and a sales price of $5,000 February 16, 1922. A 10 per cent rate of depreciation was stipulated at the hearing. The respondent further concedes a loss by the petitioner, based upon said facts. We have held that the Peavy-Byrnes Lumber Co. and the Peavy-Moore Lumber Co. were affiliated for the years 1919 to 1921, inclusive. It does not follow, however, that under the Revenue Act of 1921 these corporations filed consolidated returns for 1922, and it appears that the corporations did not claim that they were affiliated and entitled to file consolidated returns for that year. It further appears that the respondent now concedes that the petitioner, Peavy-Byrnes Lumber Co., is entitled to this deduction, which should be computed on the basis of the facts above stated.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

SMITH, STERNHAGEN, PHILLIPS, and MURDOCK dissent.